## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| **DAVID COHEN, CLU,** on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**ACCORDIA LIFE AND ANNUITY COMPANY, GLOBAL ATLANTIC FINANCIAL GROUP LIMITED, and ALLIANCE-ONE SERVICES, INC.,**<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 18-cv-00458-JAJ-RAW<br><br>First Amended Class Action Complaint<br><br>Jury Trial Demanded |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff David Cohen, CLU ("Plaintiff"), on behalf of himself and all others similarly situated (the "Class"), brings this First Amended Class Action Complaint ("Complaint") against Defendants Accordia Life and Annuity Company ("Accordia"), Global Atlantic Financial Group Ltd. ("Global Atlantic"), and Alliance-One Services, Inc. ("Alliance-One") (collectively "Defendants") to seek compensatory damages and injunctive relief. The allegations of this Complaint are based on the personal knowledge of Plaintiff as to himself and his own acts, and upon information and belief as to all other matters, based upon an investigation conducted by and through his attorneys.

## INTRODUCTION

1.     This case involves tens of thousands of insurance agents who entered into contracts with Aviva Company ("Aviva") and its affiliates, predecessors, and/or successors to sell life insurance policies and annuities. The contracts stated that Defendants (which assumed

responsibility for such contracts) would pay Plaintiff and Class members a commission for the sale of life insurance policies and annuities and, upon the renewal of those products, a "renewal" commission.

2.     The life insurance policies and annuities sold by Plaintiff and Class members were assumed by Defendant Accordia and serviced by Defendant Alliance-One.  Accordia and Alliance-One unlawfully and in violation of the contracts with Class members stopped paying Plaintiff and Class members their contractually agreed upon commissions, caused significant delays in the payment of commissions, and/or caused Class members to receive lower renewal commissions than they would have otherwise received but for Defendants' conduct.

3.     Specifically, during a "conversion period" following the assignment of life insurance policies and annuities from Aviva to Accordia that began in 2015, Defendants failed to automatically withdraw or accept premium payments from policyholders on policies sold by Plaintiff and the Class.  In turn, Defendants' conduct: (a) caused commissions to Class Members to be halted or significantly delayed; (b) caused certain policies to lapse, be surrendered, or otherwise not be renewed, thereby depriving Class members of renewal commissions on such policies; or (c) converted certain policies from one policy type to another that had a lower renewal commission rate.

4.     As a result of the halted and/or delayed commissions, Class members were damaged by the loss and deprivation of use of commission funds.  Further, as a result of the lapse or surrender of policies during the conversion period, Class members were damaged because they lost their right to receive future renewal commissions on the lapsed or surrendered policies. In addition, as a result of the improper conversion of policies to lower-tiered policy types, Class members received lower renewal commissions than they otherwise would have been entitled to

but for Defendants' improper conduct.

5.    The types of life insurance policies at issue in this Complaint are generally renewed repeatedly for many years or even decades.  Defendants' improper conduct leading to lapsed, surrendered, or otherwise non-renewed policies thus caused Class members to forego future renewal commissions for many years.

6.    Insurance regulators have initiated regulatory proceedings related to Defendants' problematic conversion program.  Defendant Accordia and its predecessor Athene Annuity and Life Company ("Athene") were served with an Order to Show Cause by the California Department of Insurance on June 18, 2018.  The Order alleged that compatibility issues between Alliance-One's servicing system and the policies to be converted led to hundreds of thousands of policyholders not receiving their bills, not receiving statutorily-mandated annual statements, not being able to pay their premiums, and not being able to access certain policy benefits.  Similarly, the New York State Department of Financial Services issued a Consent Order in June 2018 against Athene Life Insurance Company of New York and First Allmerica Financial Life Insurance Company (a subsidiary of Defendant Global Atlantic) for, among other things, failing to send premium bills to policyholders for an amount of approximately $81 million.  The Consent Order required the defendants to pay a $15 million civil penalty to the State of New York.

7.    Also, Defendants Accordia, Global Atlantic, and Alliance-One have been sued by a class of policyholders in federal court, in both the Central District of Illinois and Central District of California, for their pervasive failure to properly manage the conversion of policies from one servicing system to another.  In those cases, policyholders alleged that Defendants' systemic failure to properly collect and apply insurance premiums during the lengthy conversion

period caused policies to lapse, to have their "no-lapse guarantees" removed, to lose their guaranteed premium rates, to be converted from one policy type to another, or to otherwise lose valuable policy features. Those class actions were consolidated and have recently been settled. The settlement is subject to Court approval. The settlement includes monetary benefits for certain policyholders, and various types of injunctive relief. The settlement benefits are geared toward policyholders, not insurance agents.

8.      Defendants' misconduct, which has caused harm to Plaintiff and Class member agents in the form of withheld or significantly delayed commissions, lowered commissions, lost future renewal commissions, and the loss of ongoing customer relationships, gives rise to claims for breach of contract; breach of third party beneficiary contract; breach of the implied duty of good faith and fair dealing; negligence; tortious interference with prospective economic advantage; tortious interference with contractual relations; and unjust enrichment.

## JURISDICTION & VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because this is a class action involving more than 100 class members in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which at least one member of the Class is a citizen of a state different from a defendant.

10.      This Court has personal jurisdiction over Defendants because Defendants conduct business in Iowa, and the wrongful acts alleged herein were committed largely in Iowa.

11.      Additionally, Accordia's "Independent Producer Contract Incorporation Agreement" (the "Incorporation Agreement"), which is a contract between Accordia and its agents including Plaintiff, provides that the U.S. District Court for the Southern District of Iowa (or the Iowa District Court for Polk County) shall have exclusive jurisdiction over disputes

arising out of or related to the Incorporation Agreement and the agent's prior contracts with Accordia's predecessors including Aviva.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

13.     Plaintiff David Cohen, CLU, is and at all relevant times was, a citizen Missouri, in the County of St. Louis.  At all relevant times, Plaintiff Cohen sold life insurance policies and annuities pursuant to an enforceable contract with one or more Defendants, including an Aviva contract and an Incorporation Agreement with Accordia.  Plaintiff Cohen is a Chartered Life Underwriter ("CLU").  CLU is the premier designation for insurance professionals and the insurance profession's oldest standard of excellence with a particular emphasis placed on ethics and commitment to clients.

14.     Defendant Accordia Life and Annuity Company is, and at all relevant times was, a citizen of the State of Iowa and of the State of Tennessee.  It is a corporation organized and existing under the laws of Iowa, and is domiciled in Iowa.  Accordia's principal place of business is in Des Moines, Iowa.  Accordia is a wholly-owned direct subsidiary of Commonwealth Annuity and Life Insurance Company ("Commonwealth"), which in turn is a wholly-owned direct subsidiary of Defendant Global Atlantic Financial Group Limited.

15.     Defendant Global Atlantic Financial Group Limited is, and at all relevant times was, a citizen of the State of New York.  It is a financial services holding company with its principal place of business in New York, New York.  It is a Bermuda company.

16.     Defendant Alliance-One Services, Inc. is, and at all relevant times was, a citizen of the State of Delaware and the State of Missouri.  It is a corporation organized and existing

under the laws of the State of Delaware, with its principal place of business in Kansas City, Missouri.  Alliance-One is a subsidiary of DXC Technology Company, a publicly traded company incorporated in Nevada with its principal place of business in Falls Church, Virginia.

## FACTUAL ALLEGATIONS

### A.    Accordia's Corporate History

17.    Accordia's parent company, Global Atlantic, was originally known as Goldman Sachs Reinsurance Group ("Goldman Reinsurance").  Goldman Reinsurance was formed in 2004, and was part of the larger Goldman Sachs Group, Inc.  Soon after its formation, in 2005 Goldman Reinsurance entered the life insurance and annuity market by acquiring Accordia's parent company Global Atlantic and Commonwealth Annuity and Life Insurance Co.  In April 2013, Goldman Sachs Group Inc. divested its reinsurance business and spun off Global Atlantic as an independent company.

18.    Before Global Atlantic separated from Goldman Sachs, it had already negotiated a multi-step deal with Athene to purchase a book of life insurance policies and annuities from Athene.  Athene had previously purchased that book of business from Aviva plc and its subsidiary Aviva USA.

19.    Aviva plc, a European insurer, had previously acquired that book of insurance policies and annuities in 2006 through its purchase of AmerUs Group Co. ("AmerUS") for approximately $2.9 billion.  The new resulting company was headquartered in Iowa and branded Aviva USA.  In 2012, Aviva plc announced its plan to leave the U.S. insurance market and sell Aviva USA.

20.    Athene was interested in acquiring Aviva USA.  Around the time that Athene expressed interest in acquiring Aviva USA, Athene acquired Presidential Life Insurance

Company ("Presidential Life"), which was licensed to sell life insurance and annuity policies throughout the country.  In December 2012, Athene agreed to purchase Aviva USA for $1.8 billion.  The sale included life insurance and annuity policies.

21.     These collective transactions illustrate the breadth of the underlying policies involved in the conversion giving rise to Plaintiff's claims.  The conversion involved policies that were originated at various times over a span of many years, originating at or flowing through various successor entities until ultimately reaching Accordia.

**B.     Accordia's Multi-Step Purchase of the Life Insurance Policies**

22.     In 2013, Accordia acquired a $10 billion book of life insurance business, consisting of over 500,000 Aviva USA policies.  Rather than purchase the book directly from Aviva USA, Accordia acquired the policies through an assumption reinsurance agreement with Athene Annuity and Life Company, which had previously bought the insurance business of Aviva USA.

23.     Pursuant to the terms of the reinsurance and assumption agreement, Accordia asked each individual policyholder to consent to the transfer of their policy from Athene to Accordia.  Specifically, in 2014, Accordia sent a Notice of Transfer to each policyholder, apprising them of the acquisition and requesting their consent to transfer their policies from Athene to Accordia.  The policies for which the policyholders either affirmatively consented or consented by silence were transferred from Athene to Accordia.  For those policyholders who rejected the transfer, their policies remained insured with Athene, but were administered by Accordia under a third-party administrator agreement between Accordia and Athene.

24.     In connection with the transfer, in 2014, Accordia required Plaintiff and Class members to sign an "Independent Producer Contract Incorporation Agreement" that purported to

supersede previous agreements between Class members and Aviva and to set forth the entire agreement between Class members and Accordia.

      **C.**      **The Transition of Policies to Alliance-One's Incompatible Servicing Platform**

25.     In preparation for assuming and administering the acquired policies, in September 2013, Accordia (through its parent, Defendant Global Atlantic) entered into an agreement with Alliance-One under which Alliance-One would serve as a third-party administrator to provide policy administration services using its own proprietary system.

26.     However, Alliance-One's servicing platform was not compatible with the policies being transferred. The servicing system that Alliance-One used was incompatible with the old and diverse policies that were being transitioned from "legacy systems" created and maintained for the originating insurer's unique policies.

27.     On information and belief, Alliance-One could not replicate the original insurers' systems; Alliance-One's own system could not administer the policies; it did not have (and had to try to create) appropriate software to service the policies; it did not have the staffing to perform even mundane policyholder services – let alone the highly-skilled actuarial, accounting, and administrative services needed to properly service the significant block of legacy business; it lacked sufficient staff for both front-line servicing needs as well as supervisory staff to oversee the front-line staff; and it lacked staffing to adequately handle difficult policyholder complaints or regulatory complaints arising in the highly regulated life insurance industry.

28.     Accordia knew or should have known of the incompatibility issues before purchasing the policies and/or transitioning them to the Alliance-One platform. Accordia failed to ensure, prior to its purchase of the policies, that it or a third party servicer could adequately administer the policies. Accordia failed to properly analyze and test the Alliance-One system

before retaining Alliance-One and transferring the policies to its system.  Accordia failed to properly vet the servicing capabilities of Alliance-One, which was tasked with trying to fit the many square pegs of disparate originating insurers' policies into the round hole that was the Alliance-One system.  Accordia recklessly delegated policyholders' needs and the fate of its agents into the hands of the untested Alliance-One, which was attempting to transition large blocks of aged policies from multiple "legacy systems" all at once.

29.     Alliance-One knew or should have known of the incompatibility issues before agreeing to be retained by Accordia and attempting to transition the policies to Alliance-One's system.

30.     On information and belief, Alliance-One failed to adequately adjust or upgrade its servicing platform to accommodate the policies that were subject to the transition.  Alliance-One also failed to properly integrate, input, or reformat the detailed policy-level data as necessary to conform to the constraints of its servicing system.

31.     Accordia failed to appreciate the invaluable role of agents in delivering policyholder service.  Agents, in conjunction with insurer employees and third party administrators, are needed to provide critical expertise on policy management, troubleshoot policyholder problems, and help policyholders make informed and sound choices regarding their policies.

**D.     Defendants "Restricted" the Policies, Causing Them to Be Frozen in Time Such That Premiums Could Not Be Processed and Commissions Could Not Be Paid**

32.     Due to the incompatibility issues between Alliance-One's system and policies being transitioned, in late 2015 the vast majority of the policies were "restricted," such that they could only be administered on a manual basis.  As a result, policyholders could not receive bills,

pay premiums, manage choices under their policies, or access the benefits of their policies. Also, policyholders could not receive their statutorily-mandated Annual Statements showing policy values, cash surrender values, and other important policy information.

33.     Due to the high number of policies (more than 500,000) being converted to Alliance-One's system, they were split into two batches: Wave One (approximately 264,000 policies) and Wave Two (approximately 278,000 policies). The Wave One conversion began in or around August 2015. The Wave Two conversion began in or around January 2016. Both waves lasted for years. In February 2018, Accordia announced that only 65% of the policies had been fully converted and were in good order as of October 2017, and stated "[w]e . . . anticipate . . . that this project will be essentially complete around mid-year [2018]."[1] On information and belief, many policies still have not yet been fully converted as of the date of this Complaint.

34.     Most policies could not be converted to the Alliance-One system because policy values from the prior servicing systems were not being properly brought up to date on the new system. As a result, they were placed in the restricted status, such that they could not be administered electronically and could only be administered on a manual basis.

35.     While a policy is in restricted status, policy values cannot be brought up to date; Annual Statements and policy illustrations cannot be generated; bills for premium payments cannot be sent to policyholders; check payments cannot be accepted from policyholders; automatic recurring electronic payments cannot be accepted from policyholders' bank accounts or credit cards; and non-financial transaction requests cannot be fulfilled.

36.     When policies were restricted, Accordia claimed that commissions could not be

---

[1]  *See* http://www.globalatlanticlife.com/sites/globalatlanticlife.com/files/upload/files/FINAL1-30-18-ACCOther-0492%20Conversion%20Update%20Letter_2.pdf (last visited July 1, 2019).

paid to agents.  Accordia disclosed the following in a bulletin to its agents dated August 4, 2016:

> All transactions relating to restricted polices are suspended, including applying premium payments, therefore no commissions are being generated for those policies at this time.  As soon as a policy is unrestricted and premiums are received and applied, commissions resulting from those premiums will be credited to your commission account.[2]

37.    While policies were in restricted status, payments from policyholders could not be processed electronically.  For a number of policies (primarily limited to certain policies included in Wave Two), Defendants were able to institute a manual-billing process in which bills could be manually generated and sent to policyholders, and payments received were deposited into a separate account in which all manually-processed payments were held.  That process was complex, time-consuming, and confusing to policyholders.  Also, when payments were received and deposited into the account, they were not immediately applied to each individual policy.

38.    Upon being "unrestricted," back-premiums were due on all policies for all premium amounts that were not paid or processed during the restriction period.  Depending on when the policies were restricted and how long they were in restricted status (often several years), the back-premiums due amounted to many months' or years' worth of premiums.

39.    This came as a surprise to policyholders.  Some policyholders were unaware of the conversion problems and the fact that their policies were not being billed or automatically paid by pre-authorized electronic payments from their bank accounts.  Many policyholders were unable to pay the significant lump-sums that were due when their policies were eventually unrestricted.  In some instances, unbeknownst to policyholders, policy premiums during the restriction period were being paid via deductions from the policy's cash surrender value, such

---

[2]  *See* http://www.globalatlanticlife.com/sites/globalatlanticlife.com/files/upload/files/Commissions2.pdf (last visited July 1, 2019).

that the cash surrender value was being cannibalized.  That had a negative consequence to agents because premium payments via cash surrender value reductions in lieu of incoming cash payments deprived agents of a cash stream on which commissions could be paid.

40.     The policyholders' inability to pay large back-due premiums compounded the lengthy delays in Defendants' payment of commissions to agents.  In fact, Accordia announced in a Q&A document that it would not pay commissions on policies until the policyholder paid all back-due commissions, which payments could be delayed well beyond the date that the policy was unrestricted:

> [Question:] When will renewal commissions be paid for converted policies?

> [Answer:] Policies must be current, meaning all premium and back premium are received and applied in order for commissions to generate.  Policy owners must also complete their special payment arrangements before commissions are generated.[3]

41.     The premium-billing notices that Accordia sent to policyholders when the policies were unrestricted provided a 60-day period in which policyholders were required to pay all back-premiums and bring the policy up to date.  If payment in full was not received by that date, another billing notice (reflecting a higher amount due because it included an additional two months of premiums) was sent to the policyholder providing another 60 days in which to pay.  If payment was not received by that date, the policy was subject to being lapsed.  The billing notices did not provide policyholders with information as to whether they could establish a payment plan to pay the back-premiums.  As a result of these circumstances, many policies lapsed.  Other policies were voluntarily surrendered by policyholders who were unable or unwilling to pay the lump sums, or who were otherwise upset with Defendants' conduct and

---

[3]   *See* http://www.globalatlanticlife.com/sites/globalatlanticlife.com/files/upload/files/In_Good_Order_QuestionsandAnswers_102017.pdf (last visited July 1, 2019).

customer service during the conversion.

42.     Many of the restricted policies were known as "universal life" policies that are policies in which premiums can be paid by reductions to the policy's cash value.  As the cash value accumulates over time, it can be used to pay premiums as well as other policy expenses and fees, which often increase in amount the longer a policy is in force and the older the policyholder becomes.  At some point, a policy's accumulated cash value may deplete to a point where the policyholder must make manual premium payments (as opposed to reductions to the cash value).  If manual premium payments are not made, the policy may lapse.  Policyholders with universal life policies who were not billed for lengthy periods during the conversion period or who did not receive Annual Statements were unaware that the cash surrender value was decreasing, that cash payments might be due, that and a lapse might be imminent.

43.     Certain policyholders held "whole life" insurance policies, for which Class members were entitled to receive ongoing renewal commissions.  As a result of Defendants' failure to collect automatic premium payments during the conversion process, Defendants invoked "non-forfeiture" provisions of the whole life policies, such that if a policyholder missed a premium payment, the policy was converted to "extended term insurance."  The extended term insurance policies had lower commission rates relative to the whole life policies.  Thus, Class members were harmed by the reduced commissions.

44.     Statutorily mandated Annual Statements provide policyholders with important information about how their policies are performing.  For example, among other things, they set forth what the current accumulated cash value is, what the past or future premium payments were or will be, what dividends are available to pay premiums, and what expenses are being charged. As a result of Defendants' faulty conversion processes, policyholders whose policies were in

restricted status did not receive Annual Statements and could not make informed decisions about their policies.

45.     When restricted policies became unrestricted, Defendants sent policyholders an initial premium-billing notice without first sending an Annual Statement.  The premium-billing notice set forth a lump-sum amount due, without identifying the portion that was attributable to back-premiums related to conversion issues.  Also, the premium-billing notice did not provide policyholders with an option to establish a payment plan if policyholders needed longer than 60 days to pay the back due amounts.

46.     For policies that lapsed when policyholders were unable to pay the amounts due, Defendants failed to work with policyholders to keep the policies active or promptly reinstate the policies after they lapsed.

47.     During the period of making payments for back-premiums, commissions were not paid to Class members.  Commissions would be paid only after all back-due payments were made by policyholders.  That was a business decision by Defendants, not a statement of an inevitable fact.  Commissions could have been, and should have been, paid on a rolling basis as premium payments re-commenced.

**E.      Defendants Failed to Pay Agents Their Contractually Agreed Upon Commissions**

48.     Pursuant to their contracts with Defendants, Class members sold life insurance products and annuities such as, among other things, term life insurance (which provides a set death benefit for a pre-defined period of time), whole life insurance (which comes with a guaranteed cash value during the life of the policy), and universal life insurance (which offers flexible premiums instead of fixed premiums).

49.     In the insurance industry, insurance agents enter into contracts with insurance

14

companies to procure applications from policyholders for insurance products. In return, the agents are to receive commissions from the insurance company on the sale of each life insurance policy. In the first year of a life insurance policy, the agent typically receives anywhere from 30% to 90% of the premium paid for the policy. In later years, referred to as the renewal period, the agent typically receives commissions ranging from 1% to 10% of each year's premium.

50.    On April 14, 2008 and May 2, 2014, Plaintiff entered into an agent contract (called an "Independent Producer Contract") with Aviva. The contract was subsequently assumed by Accordia. The contract provided that Plaintiff would "procure applications for the insurance products." In return, Plaintiff was to be paid "[c]ompensation, fees and bonuses" in accordance with applicable commissions schedules. The commission schedules generally stated that Plaintiff was to be paid an initial percentage for the first year of each policy, and renewal commissions in each subsequent year.

51.    Prior to August 2015, Aviva regularly paid Plaintiff and Class members their commissions and renewal commissions on life insurance and annuities sold by them pursuant to the parties' contracts.

52.    In or around August 2015, Defendant Alliance-One began processing the policies to be converted pursuant to the transition of the policies from Athene to Accordia.

53.    Following the transition, as a result of Defendants' failure to properly administer the policies, Defendants: (i) failed to pay proper or timely commissions on existing policies; and (ii) caused certain policies to lapse or be surrendered, which in turn terminated Class members' interest in future renewal commissions from those policies. As a result, Plaintiff and Class members have been damaged.

54.    The conversion process for at least some of the underlying policies lasted more

than four years. It began in 2015 and still continues today.

55.     In May 2019, Accordia sent a letter to Plaintiff and other agents, stating that the

conversion process was purportedly substantially complete. The letter acknowledged that the

conversion was significantly delayed due to the age and complexity of the converted data:

> After the acquisition [of Aviva], we made a commitment to modernize the
> underlying technology by moving or "converting" the life insurance policies off
> multiple outdated systems onto a single, current platform. It was more complex
> than we anticipated and took longer than planned. . . . The life insurance industry
> has been slower to modernize technology largely due to the underlying difficulty
> of migrating contracts with lifetime durations that were issued decades ago.

56.     Despite Accordia's representation that the conversion has been largely completed,

on information and belief, problems remain with at least some of the underlying policies as of

the date of this Complaint. For example, cash surrender values continue to be understated for

certain policies, including policies held by Plaintiff's clients. Similarly, "Paid Up Additions" are

currently understated for certain policies, including policies held by Plaintiff. Paid Up Additions

are supplemental payments by policyholders that increase the death benefit and living benefit by

increasing the policy's cash value. Paid-Up Additions and the underlying cash values attributed

to them inexplicably declined from one year to the next during the conversion period even

though dividends used by policyholders to pay the fixed annual premium were (and continue to

be) in excess of the underlying premiums due each year.

57.     Also, despite Accordia's representation that the conversion process has been

completed, Defendants still have not paid all past-due commissions owed to all Class members.

Among other things, commissions continue to be delayed for policies in which policyholders

need additional time to pay back-premiums that accrued during the restriction period.

Defendants should pay commissions on a rolling basis when incremental back-premiums are

paid by policyholders, not just at the end of the repayment period when policyholders make the

last of their catch-up payments.

58.    Defendants have not sent commission statements or other correspondence to Plaintiff and Class members clarifying whether all previously delayed commissions have been paid in full.  Plaintiff believes he still has not been made whole for all previously withheld commissions.  Plaintiff has not been able to meaningfully access Accordia's agent portal because the portal provides only partial access to policy information and commissions data while the conversion process is pending.  Accordia noted in an August 4, 2016 update to agents that "[w]e are actively working to resolve issues preventing you [agents] from seeing the detail for restricted policies."[4]  On information and belief, those issues have still not been fully resolved with respect to agents' access to policy information.

59.    Accordia has recognized that the "conversion process has created frustration for [agents] and policy owners."[5]  Accordia also noted that "the conversion process has been challenging and we thank you [agents] for your patience."[6]  These acknowledgements severely understate the amount of time, effort, and inconvenience forced upon agents as a result of the lengthy conversion problems.

60.    Plaintiff and Class members have spent significant amounts of time corresponding with policyholders, researching and responding to policyholders' questions, and acting as a liaison between policyholders and Accordia regarding problems with converted policies.  The

---

[4]    *See* http://www.globalatlanticlife.com/sites/globalatlanticlife.com/files/upload/files/Restriction%20and%20Restricted%20Policies2.pdf (last visited July 1, 2019).

[5]    *See* http://www.globalatlanticlife.com/sites/globalatlanticlife.com/files/upload/files/FINAL1-30-18-ACCOther-0492%20Conversion%20Update%20Letter_2.pdf (last visited July 1, 2019).

[6]    *See* http://www.globalatlanticlife.com/sites/globalatlanticlife.com/files/upload/files/Conversion_Update_Letter_102017.pdf (last visited July 1, 2019).

time spent has greatly exceeded what is typically expended by agents on policy administration issues in the normal course of business.

61.     Also, policyholders have directed anger and disappointment toward Plaintiff and Class members as a result of Defendants' misconduct.  Class members' relationships and goodwill with policyholders has been harmed.  The ill-will led some policyholders to surrender their policies early and replace them with other insurers' products, leading to reduced renewal commissions for Class members.  The ill-will also deprived Class members from receiving future new business or referrals from existing clients.

### F.    Global Atlantic is Liable for Accordia's Misconduct

62.     Global Atlantic is liable for Accordia's misconduct by virtue of, *e.g.*, Global Atlantic's parent relationship to Accordia.  Global Atlantic exercised control over Accordia's actions with respect to Accordia's conduct alleged herein.

63.     For example, Accordia's update letters to agents regarding conversion issues were generally sent by Global Atlantic employees.  Also, Accordia's conversion update web page – http://www.globalatlanticlife.com/policy-conversion – is hosted on Global Atlantic's website. Accordia does not have its own separate website.

64.     Several officers of Accordia are also officers of Global Atlantic, including Accordia President David Paul Wilken and Accordia CEO Robert Michael Arena.[7]

65.     In 2016, Accordia disclosed that "Athene sold Aviva USA's life business to *Global Atlantic*.  Global Atlantic is renaming Aviva USA's life business Accordia Life."[8]

---

[7]  *See* Annual Statement of the Accordia Life and Annuity Company, Dec. 31, 2018, at pg. 1, available at https://www.globalatlantic.com/sites/default/files/upload/files/Accordia_2018_Annual_Statement.PDF (last visited July 1, 2019); Global Atlantic list of current officers, available at https://www.globalatlantic.com/about-global-atlantic (last visited July 1, 2019).

[8]  *See* http://www.globalatlanticlife.com/sites/globalatlanticlife/files/upload/files/ACC2001_03-

G.    **Ongoing Civil Litigation and Government Investigations Corroborate Plaintiff's Allegations**

66.    Defendants have been sued by a class of policyholders in federal court, in both the Central District of Illinois and Central District of California, for causing the lapse or cancellation of insurance policies owned by consumers.  The lawsuits, which have been consolidated, were brought on behalf of insureds who alleged various types of harm from Defendants' problematic conversion process.  The allegations, in sum, were as follows:

> Plaintiffs allege that . . . Class Members were damaged when Defendants stopped automatically withdrawing, accepting, or applying their premium payments during a "Conversion Period," following Accordia's expansion and acquisition of other insurance companies.  Plaintiffs allege Defendants' systemic failure to properly collect and apply insurance premiums during the Conversion Period caused policies to lapse, to have their "no-lapse guarantees" removed, to be converted from one type of policy to another type of policy, or to otherwise lose valuable policy features ("Conversion-Related Issues").[9]

67.    The policyholder class action has been settled, pending court approval.  The settlement includes monetary benefits for certain class members, as well as various types of injunctive relief.  The settlement benefits are geared toward policyholders, not insurance agents.[10]  For example, the injunctive relief includes "special payment arrangements" that allow policyholders to gradually repay back-due premiums over a 24-month period.  The lengthy repayment period will further delay agents' receipt of commissions because commissions will continue to be withheld until the final repayment is received from the applicable policyholder.  Other injunctive relief includes back-dating of premium receipts.  The back-dating will not

---

16_Policy_Transition.pdf (emphasis added) (last visited July 1, 2019).

[9]  *See* Memorandum in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, at pg. 1, in *Clapp v. Accordia Life and Annuity Co. and Alliance-One Services, Inc.*, No. 17-cv-02091, Dkt. No. 43 (C.D. Ill., May 10, 2019).

[10]  *Id.* at pg. 3-6.

benefit agents' commissions.  Defendants also agreed to review policies in lapse status to ensure

that policyholders received proper lapse notices.  Lapses will remain valid so long as the

policyholder received proper notice of the lapse.  Defendants also agreed to engage a third party

auditor to test policies for any remaining conversion-related issues.  The auditor's procedures are

not geared toward ensuring that agents' commissions are being properly calculated and timely

paid.  Several other categories of injunctive relief were reached, with no benefit to agents.

    68.    On June 18, 2018, the California Department of Insurance filed an Accusation

(*i.e.*, Complaint) against Accordia and Athene seeking an Order to Show Cause, alleging that the

transition of approximately 500,000 policies was disastrous and led to the loss of tens of

thousands of policies.  The Accusation stated as follows:

> From the very start of administering the policies, Accordia faced
> numerous substantial difficulties. . . .  Due to compatibility issues between
> Alliance-One's policy management system and the policies to be converted, in
> late 2015, the vast majority of the policies were "restricted," such that they could
> not be converted to the system and could only be administered on a manual basis.
> As a result, policyholders did not receive their statutorily-mandated annual
> statements, nor could they receive bills, pay premiums, or access any of the
> benefits of their policies.  Over two years have passed since the conversion issues
> first surfaced and policies still remain restricted.
>
> Even after a policy gets "unrestricted" and is being electronically
> administered, problems continue for policyholders, raising questions as to
> whether their policies are being serviced properly.  For instance, policyholders
> still are not receiving their up-to-date annual statements.  Some face risk of lapse
> because premiums were not billed or collected while their policies were restricted,
> which created unpaid past premium obligations amounting to thousands of dollars
> in some cases.  Without the benefit of their annual statements, these policyholders
> cannot make a fully-informed decision as to whether to pay the back premiums
> and keep their policies in force.  Other policyholders have suffered accounting
> issues, with premium payments being improperly applied or not [applied] at all.
> Others have expressed concerns that they feel stuck with their policies due to
> advanced age.
>        . . . .
>
> Beginning early 2016, the Department has received more than 100
> consumer complaints, many of which relate to problems with premium billings

and payments and the failure to receive annual reports.[11]

69.    The California Department of Insurance proceeding remains pending.  Over a year has passed, and no progress has been publicly announced.

70.    The New York State Department of Financial Services issued a June 28, 2018 Consent Order against Athene Life Insurance Company of New York and First Allmerica Financial Life Insurance Company, a subsidiary of Defendant Global Atlantic, related to the faulty conversion process.  An investigation was initiated following receipt of many consumer complaints.  The investigation found that Athene did not provide required information to 15,000 New York policyholders for several years, including premium notices (totaling $81 million in premiums), annual reports, and cash surrender value notices.  The Consent Order noted that "due to problems with the conversion process, [Athene and First Allmerica] placed the majority of New York policies on restricted status and were unable to move them off of restricted status for an extended period of time."[12]  The Consent Order required Athene and First Allmerica to pay a $15 million civil penalty to the State of New York, and to take various corrective actions.  The corrective actions were geared toward benefitting policyholders, not insurance agents.

71.    The Texas Department of Insurance has notified Athene that it may undertake an enforcement proceeding similar to those brought by the California Department of Insurance and New York Department of Financial Services.

72.    Athene Holding Ltd. recognized the numerous issues triggered by the faulty conversion, stating the following in its Form 10-Q for the period ended March 31, 2019:

> Regulatory Matters – Our U.S. insurance subsidiaries have experienced

---

[11]    *See* http://www.insurance.ca.gov/0400-news/0100-press-releases/2018/upload/nr066-2018AccordiaOrder061218.pdf at pg. 2-3, 7 (last visited July 1, 2019).

[12]    *See* https://www.dfs.ny.gov/docs/about/ea/ea180628athene.pdf at pg. 3, 6 (last visited July 1, 2019).

increased service and administration complaints related to the conversion and administration of the block of life insurance business acquired in connection with our acquisition of Aviva USA and reinsured to affiliates of Global Atlantic [Accordia].  The life insurance policies included in this block have been and are currently being administered by AllianceOne Inc. (AllianceOne), a subsidiary of DXC Technology Company, which was retained by such Global Atlantic affiliates to provide services on such policies.  AllianceOne also administers certain annuity policies that were on Aviva USA's legacy policy administration systems that were also converted in connection with the acquisition of Aviva USA and have experienced similar service and administration issues.

As a result of the difficulties experienced with respect to the administration of such policies, we have received notifications from several state regulators, including but not limited to the New York State Department of Financial Services (NYSDFS), the California Department of Insurance and the Texas Department of Insurance, indicating, in each case, that the respective regulator planned to undertake a market conduct examination or enforcement proceeding of the applicable U.S. insurance subsidiary relating to the treatment of policyholders subject to our reinsurance agreements with affiliates of Global Atlantic and the conversion of such annuity policies, including the administration of such blocks by AllianceOne.  On June 28, 2018 we entered into a consent order with the NYSDFS resolving that matter in a manner that, when considering the indemnification received from affiliates of Global Atlantic, did not have a material impact on our financial condition, results of operations or cash flows.

In addition to the foregoing, we have received inquiries, and expect to continue to receive inquiries, from other regulatory authorities regarding the conversion matter.  In addition to the examinations and proceedings initiated to date, it is possible that other regulators may pursue similar formal examinations, inquiries or enforcement proceedings and that any examinations, inquiries and/or enforcement proceedings may result in fines, administrative penalties and payments to policyholders.  While we do not expect the amount of any such fines, penalties or payments arising from these matters to be material to our financial condition, results of operations or cash flows, it is possible that such amounts could be material.

Pursuant to the terms of the reinsurance agreements between us and the relevant affiliates of Global Atlantic, the applicable affiliates of Global Atlantic have financial responsibility for the ceded life block and are subject to significant administrative service requirements, including compliance with applicable law. The agreements also provide for indemnification to us, including for administration issues.[13]

---

[13]  *See* https://ir.athene.com/Cache/397853896.PDF?O=PDF&T=&Y=&D=&FID=397853896&iid=4273880 at pg. 45 (last visited July 1, 2019).

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(1)-(3) seeking monetary and injunctive relief on behalf of the following classes (collectively the "Class"):

**A.      "Policy in Effect" Class**

All persons who sold a life insurance policy or annuity now insured by Accordia and whose commissions on any such policy or annuity were withheld or delayed due to conversion issues while the policy remained in effect; and

**B.      "Lapsed or Surrendered Policy" Class**

All persons who sold a life insurance policy or annuity insured by Accordia and whose right to future commissions from any such policy or annuity ceased due to lapse or surrender of the policy during the conversion period.

74.     This action is properly maintainable as a class action under Fed. R. Civ. P. 23(a) and (b)(1)-(3).

75.     The class consists of tens of thousands or more persons, such that joinder of all Class members is impracticable.

76.     There are questions of fact and law that are common to all Class members and that predominate over questions affecting only individual members.  These questions include, but are not limited to:

a.      Whether Defendants breached their contracts with Class members by failing to pay commissions on life insurance policies and annuities;

b.      Whether Defendants breached non-contractual duties owed to Class members by failing to pay commissions on life insurance policies and annuities;

c.       Whether Defendants breached their duties of good faith and fair dealing owed to Class members;

d.       The appropriate types of damages owed to the Class; and

e.       Whether and to what extent injunctive relief is appropriate for the Class.

77.     The claims of Plaintiff are typical of the claims of other Class members because they are based on the same underlying facts and legal theories.  Plaintiff has no interests that are antagonistic to the interests of other Class members.

78.     Plaintiffs is an adequate representative of the Class, and he has retained competent legal counsel experienced in class action and complex litigation.

79.     A class action is an appropriate and superior method for the fair and efficient adjudication of this controversy.  The pursuit of thousands of individual lawsuits would not be economically feasible for individual Class members, would cause a strain on judicial resources, and would increase the likelihood of inconsistent adjudications.  Each plaintiff in such individual lawsuits would need to prove a virtually identical set of facts in order to recover compensable damages.

80.     This action does not present any unique management difficulties.

81.     Defendants have acted or refused to act on grounds that apply generally to the entire Class, such that injunctive relief is appropriate on a class-wide basis pursuant to Fed. R. Civ. P. 23(b)(2).

## COUNT I

## BREACH OF CONTRACT

### (Against Defendants Accordia and Global Atlantic)

82.     Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set

forth in this Count.

83.    Plaintiff and the Class entered into contracts with Accordia, in which Accordia agreed to pay commissions to the Class in exchange for originating life insurance policies and annuities and performing ongoing policyholder services and retention or persistency efforts.

84.    Plaintiff and the Class performed services under the contracts by originating life insurance policies and annuities.

85.    Accordia breached the contractual agreements by failing to fully or timely pay commissions to Plaintiff and the Class.

86.    Global Atlantic is liable for Accordia's breach of contract because, *e.g.*, Global Atlantic exercised control over Accordia's actions with respect to the relevant conduct alleged herein.

87.    As a direct and proximate result of Accordia's breach of contract, Plaintiff and Class members have been damaged.  Damages include, but are not limited to, the loss of commissions; significant delays in the receipt of commissions; and loss of the right to receive future renewal commissions from policies that lapsed, were surrendered, or otherwise were not renewed due to conversion issues.

88.    Plaintiff and Class members are entitled to monetary damages, as well as injunctive relief requiring Accordia and Global Atlantic to prevent and restrain the violations alleged herein.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Class and against Accordia and Global Atlantic for:

(A)    Actual and compensatory damages, with interest;

(B)    Restitution, disgorgement, and other equitable monetary relief;

(C)      Attorneys' fees, litigation expenses, and costs;

(D)      Injunctive relief necessary to prevent and restrain Accordia and Global Atlantic from engaging in further or ongoing unlawful conduct, as alleged; and

(E)      Any other relief this Court deems equitable and just.

## COUNT II

## BREACH OF THIRD PARTY BENEFICIARY CONTRACT

### (Against Defendant Alliance-One)

89.      Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth in this Count.

90.      Alliance-One entered into a contract with Accordia and/or Global Atlantic, in which Alliance-One agreed to perform policy administration services regarding the life insurance policies and annuities at issue herein.  Insurance agents were express or implied intended third party beneficiaries of that contract.  Alliance-One's servicing of the policies was intended in part to benefit agents regarding the processing of premium payments and the resulting payment of commissions.

91.      The contract required Alliance-One to administer the "premium collection" process, among other things.[14]  Alliance-One breached the contract by failing to properly and timely collect and process premium payments.  Alliance-One's breach, in turn, led to the withholding of agents' commissions.

92.      Plaintiff and Class members are within the category of individuals – insurance agents – that were intended third party beneficiaries of the contract.

---

[14]   *See* http://www.globalatlanticlife.com/sites/globalatlanticlife.com/files/upload/files/TPA_NoticeFinal Wave_FINAL.pdf (last visited July 1, 2019); *accord* http://www.globalatlanticlife.com/sites/ globalatlanticlife.com/files/upload/files/TPA_FAQs_FinalWave_FINAL.pdf (last visited July 1, 2019).

93.    It was foreseeable to Alliance-One that a breach of its contractual duties could harm agents.

94.    As a direct and proximate result of Alliance-One's breach of its servicing contract, Plaintiff and Class members have been damaged.  Damages include, but are not limited to, the loss of commissions; significant delays in the receipt of commissions; and loss of the right to receive future renewal commissions from policies that lapsed, were surrendered, or otherwise were not renewed due to conversion issues.

95.    Plaintiff and Class members are entitled to monetary damages, as well as injunctive relief requiring Alliance-One to prevent and restrain the violations alleged herein.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Class and against Alliance-One for:

(A)    Actual and compensatory damages, with interest;

(B)    Restitution, disgorgement, and other equitable monetary relief;

(C)    Attorneys' fees, litigation expenses, and costs;

(D)    Injunctive relief necessary to prevent and restrain Alliance-One from engaging in further or ongoing unlawful conduct, as alleged; and

(E)    Any other relief this Court deems equitable and just.

## COUNT III

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING FOR LOST COMMISSIONS DUE TO DEFENDANTS' IMPROPER CONDUCT

### (Against All Defendants)

96.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth in this Count.

97.    Defendants owed a duty to Plaintiff and the Class to perform their policy

27

servicing obligations with due care and to exercise good faith and fair dealing in performing

those obligations.

98.     There is an implied covenant under the law that neither party to a contract will do

anything that will have the effect of interfering with the right of the other party to receive the

fruits of the contract.  Defendants violated this implied covenant by failing to ensure that

premium payments were properly billed, collected, and/or applied during the conversion period.

Defendants' conduct led to the loss or substantial delay of commissions owed to Class members.

99.     There is an express term in each Class member's contract with Accordia, which

requires compensation to agents based on payment of policyholders' premiums and renewal of

policies.  That express term gave rise to an implied obligation by Defendants to allow

policyholders to pay their premiums and renew their policies.  Defendants breached that

obligation when failing to exercise good faith and fair dealing in servicing the policies.

100.     To the extent Defendants had discretion to cancel any of the underlying insurance

policies, such discretion was limited to good faith cancellations.  Defendants had an implied

obligation of good faith and fair dealing with respect to any such cancellations.  Defendants had

no reasonable basis on which to cancel the underlying policies.

101.     The terms of Alliance-One's servicing contract with Alliance and/or Global

Atlantic required Alliance-One to perform the premium collection function.  The contract gave

rise to an implied obligation by Alliance-One to act in good faith to allow policyholders to pay

their premiums and renew their policies.  Alliance-One breached its obligation when failing to

exercise good faith and fair dealing in servicing the policies.  Plaintiff and Class members, as

intended third party beneficiaries of that contract, were harmed by Alliance-One's conduct.

102.     As a result of Defendants' conduct, Class members' commissions were withheld

or substantially delayed.  Also, certain policies lapsed or were surrendered, depriving Class members of the right to future commissions from those policies.

103.    Defendants' breach of the duty of good faith and fair dealing has proximately caused damage to Plaintiff and the Class.  Damages include, but are not limited to, the loss of commissions; significant delays in the receipt of commissions; and loss of the right to receive future renewal commissions from policies that lapsed, were surrendered, or otherwise were not renewed due to conversion issues.

104.    Plaintiff and Class members are entitled to monetary damages, as well as injunctive relief requiring Defendants to prevent and restrain the violations alleged herein.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Class and against Defendants for:

(A)    Actual and compensatory damages, with interest;

(B)    Restitution, disgorgement, and other equitable monetary relief;

(C)    Attorneys' fees, litigation expenses, and costs;

(D)    Injunctive relief necessary to prevent and restrain Defendants from engaging in further or ongoing unlawful conduct, as alleged; and

(E)    Any other relief this Court deems equitable and just.

## COUNT IV

## NEGLIGENCE

## (Against All Defendants)

105.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth in this Count.

106.    Defendants owed a duty to Plaintiff and the Class to properly charge, collect, and

apply premium payments for life insurance policies and annuities such that commissions would be generated and paid from those premium payments.

107.    Defendants also owed a duty to Plaintiff and the Class to refrain from actions that would have a negative impact on the life insurance policies, annuities, and resulting commissions that would be generated from those policies.

108.    Defendants breached their duties by failing to properly charge, collect, and apply premium payments and, consequently, failing to pay complete and timely commissions to the Class.

109.    Class members were in a principal-agent relationship with Defendants.  In that relationship, Defendants had an obligation to collect premiums and pay commissions to Class members.

110.    Defendants' misconduct was a proximate cause of Class members' damages. Damages include, but are not limited to, the loss of commissions; significant delays in the receipt of commissions; and loss of the right to receive future renewal commissions from policies that lapsed, were surrendered, or otherwise were not renewed due to conversion issues.

111.    It was reasonably foreseeable to Defendants that their breaches of duties would lead to a loss or delay of commissions paid to Plaintiff and the Class.

112.    Plaintiff and Class members are entitled to monetary damages, as well as injunctive relief requiring Defendants to prevent and restrain the violations alleged herein.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Class and against Defendants for:

(A)    Actual and compensatory damages, with interest;

(B)    Restitution, disgorgement, and other equitable monetary relief;

(C)    Attorneys' fees, litigation expenses, and costs;

(D)    Injunctive relief necessary to prevent and restrain Defendants from engaging in further or ongoing unlawful conduct, as alleged; and

(E)    Any other relief this Court deems equitable and just.

## COUNT V

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Against All Defendants)

113.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth in this Count.

114.    Plaintiff and Class members entered into contractual relations with Accordia for the payment of commissions.

115.    Plaintiff and Class members held a reasonable expectation of receiving future commissions from policy renewals.

116.    All Defendants knew that Class members entered into contractual relations with Accordia for the payment of commissions.  Defendants knew that commissions were reasonably expected to be paid on future renewals of the life insurance policies and annuities.  It is common in the insurance industry for life insurance policies and annuities to be renewed continuously for extended periods of time, often decades or more.

117.    Defendants' conduct in failing to properly administer the life insurance policies and annuities caused many policies to lapse, be surrendered, or otherwise not be renewed.  The lapses, surrenders, or non-renewals caused Plaintiff and Class members to lose their interests in future commissions that otherwise would have been earned from renewals.

118.    Defendants knowingly and intentionally engaged in conduct that interfered with

Class members' expectation of future commissions from policy renewals.

119.    Defendants knowingly failed to properly administer policyholders' insurance policies and annuities.  Defendants knowingly failed to adequately process policyholders' premium payments.

120.    Defendants knew that their failure to properly administer the policies and annuities could lead to policy lapses and surrenders, which in turn would eliminate Class members' prospective economic advantage from anticipated renewal commissions.

121.    Defendants' failure to properly administer the insurance policies and annuities caused a substantial interference with the contracts between Accordia and the Class, and the prospective economic advantage to be received by Class members from those contracts.  As a result of Defendants' conduct, premiums were not collected and processed, lapses and surrenders took place, and Class members' interests in future commissions were relinquished.

122.    Defendants' actions in failing to properly service the policies were improper by industry standards.  It is not customary in the insurance industry to fail to bill, collect, and process premiums for several months or years during conversion from one servicing platform to another.  The breadth and length of Defendants' improper conduct was inconsistent with industry standards.

123.    Defendants' misconduct was a proximate cause of Class members' damages. Damages include, but are not limited to, the loss of prospective economic advantage, namely future renewal commissions that otherwise would have been received but will not be received because policies lapsed, were surrendered, or otherwise were not renewed due to conversion issues.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and

the Class and against Defendants for:

(A)    Actual and compensatory damages, with interest;

(B)    Restitution, disgorgement, and other equitable monetary relief;

(C)    Attorneys' fees, litigation expenses, and costs;

(D)    Injunctive relief necessary to prevent and restrain Defendants from engaging in further or ongoing unlawful conduct, as alleged; and

(E)    Any other relief this Court deems equitable and just.

<u>**COUNT VI**</u>

<u>**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**</u>

<u>**(Against Defendant Alliance-One)**</u>

124.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth in this Count.

125.    Plaintiff and Class members entered into contractual relations with Accordia for the payment of commissions.

126.    Alliance-One knew that agents entered into contractual relations with Accordia for the payment of commissions.

127.    Alliance-One knowingly and intentionally engaged in conduct that interfered with the contractual relations between Class members and Accordia.

128.    Alliance-One knew that its servicing platform was incompatible with policyholder data concerning the life insurance policies and annuities acquired by Accordia.  Alliance-One knew or should have known of the incompatibility before it agreed to accept its role as servicer of the policies.

129.    Alliance-One intentionally agreed to administer Accordia's policies before

ensuring that its servicing platform was compatible with the policy data.

130.    Alliance-One knowingly failed to properly manage and administer policyholders' insurance policies and annuities.  Alliance-One knowingly failed to adequately process policyholders' payments.

131.    Alliance-One knew that its failure to properly administer the policies and annuities could lead to an interference with Accordia's contractual obligation to pay commissions to Plaintiff and the Class.

132.    Alliance-One's failure to properly administer the insurance policies and annuities caused a substantial interference with the contracts between Accordia and the Class.  As a result of Alliance-One's misconduct, premiums were not collected and processed, and commissions were not fully or timely paid to the Class.

133.    Alliance-One's actions in both accepting the servicing role and failing to properly service the policies were improper by industry standards.  It is not customary in the insurance industry to accept a servicing engagement without knowing if the servicing platform is compatible with the policyholder data.  It is not customary in the insurance industry to fail to bill, collect, and process policyholder premiums for several months or years during conversion from one servicing platform to another.

134.    Alliance-One's motive was to receive substantial servicing fees from Accordia, regardless of Alliance-One's inability to adequately service the policies.

135.    Alliance One's misconduct was a proximate cause of Class members' damages. Damages include, but are not limited to, the loss of commissions; significant delays in the receipt of commissions; and loss of the right to receive future renewal commissions from policies that lapsed, were surrendered, or otherwise were not renewed due to conversion issues.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Class and against Alliance-One for:

(A)     Actual and compensatory damages, with interest;

(B)     Restitution, disgorgement, and other equitable monetary relief;

(C)     Attorneys' fees, litigation expenses, and costs;

(D)     Injunctive relief necessary to prevent and restrain Alliance-One from engaging in further or ongoing unlawful conduct, as alleged; and

(E)     Any other relief this Court deems equitable and just.

## COUNT VII

## UNJUST ENRICHMENT

## (Against All Defendants)

136.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth in this Count.

137.    Defendants were unjustly enriched.  Accordia was unjustly enriched by the receipt of insurance premiums for policies generated by Class members, without making a corresponding timely payment of commissions to Class members.  Alliance-One was unjustly enriched by the receipt of servicing fees from Accordia while performing services that harmed the Class.

138.    Defendants' enrichment was at the expense of Plaintiff and the Class.  Accordia held policyholder premiums without timely paying the associated commissions to the Class. Alliance-One held servicing fees paid by Accordia despite failing to properly perform its servicer function, which in turn adversely affected Class members' commissions.

139.    It would be unjust to allow Defendants to retain the monetary benefits they

received under the circumstances.  While Accordia retained premiums from policyholders, and Alliance-One retained servicing fees, Class members were forced to forgo the timely receipt of commissions.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Class and against Defendants for:

(A)    Relinquishment of Accordia's unjustly retained premium payments, to the extent needed to compensate Class members for their losses;

(B)    Relinquishment of Alliance-One's servicing fees, to the extent needed to compensate Class members for their losses;

(C)    Restitution, disgorgement, and other equitable monetary relief;

(D)    Attorneys' fees, litigation expenses, and costs;

(E)    Injunctive relief necessary to prevent and restrain Defendants from engaging in further or ongoing unjust conduct, as alleged; and

(F)    Any other relief this Court deems equitable and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial on all counts for which a trial by jury may be permitted.


Dated: July 15, 2019                     __/s/ J. Barton Goplerud_____
                                         J. Barton Goplerud, AT0002983
                                         Brian O. Marty, AT0011622
                                         **SHINDLER, ANDERSON, GOPLERUD &**
                                         **WEESE, P.C.**
                                         5015 Grand Ridge Drive, Suite 100
                                         West Des Moines, IA 50265-5749
                                         Telephone:  (515) 223-4567
                                         Facsimile: (515) 223-8887
                                         Email: goplerud@sagwlaw.com
                                         Email: marty@sagwlaw.com

36

David Cates
**CATES MAHONEY, LLC**
216 West Pointe Drive, Suite A
Swansea, IL 62226
Telephone: (618) 277-3644
Facsimile: (618) 277-7882
Email: dcates@cateslaw.com

Shanon J. Carson
Michael Dell'Angelo
Jon Lambiras
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: scarson@bm.net
Email: mdellangelo@bm.net
Email: jlambiras@bm.net

kal8607098

## **CERTIFICATE OF SERVICE**

I hereby certify that the above First Amended Class Action Complaint was served upon all counsel of record through the Court's electronic filing system on July 15, 2019.


Dated: July 15, 2019                    __/s/ Michael Dell'Angelo_____